# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERICA OLSEN, *an individual, and* KALEA WOODS, *an individual,*<br><br>Plaintiffs,<br><br>vs.<br><br>WILLIAM "RICK" SINGER, THE KEY WORLDWIDE FOUNDATION, THE EDGE COLLEGE & CAREER NETWORK, LLC, d/b/a "THE KEY," THE UNIVERSITY OF SOUTHERN CALIFORNIA, STANFORD UNIVERSITY, UNIVERSITY OF CALIFORNIA LOS ANGELES, THE UNIVERSITY OF SAN DIEGO, THE UNIVERSITY OF TEXAS AT AUSTIN, WAKE FOREST UNIVERSITY, YALE UNIVERSITY, and GEORGETOWN UNIVERSITY,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiffs ERICA OLSEN and KALEA WOODS, individually and on behalf of all others similarly situated, brings this action based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys.

## I. OVERVIEW

1.  This Class Action Lawsuit revolves around two fraudulent college-admission schemes coordinated between three distinct groups: (1) parents whose college-age children had insufficient test scores and other credentials to gain admission to highly selective universities, but who nevertheless believed that they could bribe their child's way through the college admissions door; (2) a California con-man, William "Rick" Singer, who, through the use of a fraudulent college-

admissions-mentoring company and a bogus California charitable foundation, saw an opportunity to enrich himself to the tune of millions of dollars through fraud and bribery; and (3) individuals involved in the college admission pipeline who were supposed to keep the college admission process honest (including standardized test administrators and representatives of at least seven highly selective Universities) who were willing to accept bribes and thereby taint the college admission process.

2.   According to the first scheme (the "**Test Cheating**" scam), parents, in order to get their teenaged children into highly selective colleges for which the teenagers were not otherwise qualified, would pay hefty sums (frequently six-figure fees) to Singer, his business, or his fraudulent charity; and, in exchange, Singer would arrange for imposters to pose as the students and take their college entrance examinations (ACT or SAT) for them.

3.   According to the second scheme (the "**Student-Athlete Recruitment** " scam), parents would pay Singer, his business, or his fraudulent charity huge sums of money; and, in exchange, Singer would create bogus sports profiles for the parent's teenaged student, making it seem as though the teenager was a superior athlete in a sport.  Then Singer would offer significant hefty bribes to employees of the universities—typically coaches or managers in the school's athletic department.  Under college admission practices, university admissions programs would set aside a certain number of "slots" for admission of students who excelled in certain sports.  The bribed university officials would then bypass otherwise qualified student candidates and instead insert into those athletic admissions slots the unqualified rich students who had bribed their way into the university.

4.   As a result of both of these coordinated fraudulent bribery schemes, conducted through wire and mail fraud, unqualified students found their way into the admissions rolls of highly selective universities, while those students who played by the rules and did not have college-bribing parents were denied admission.

5.   Meanwhile, each of the universities were negligent in failing to maintain adequate protocols and security measures in place to guarantee the sanctity of the college admissions process, and to ensure that their own employees were not engaged in these type of bribery schemes.

**CLASS ACTION COMPLAINT**

6.  Each of the qualified, rejected students was damaged by the fraudulent and negligent conduct of the Defendants in that, at a minimum, each Class member paid college admission application fees to the Defendant universities without any understanding or warning that unqualified students were slipping in through the back door of the admissions process by committing fraud, bribery, cheating, and dishonesty.

7.  Each of the universities took the students' admission application fees while failing to take adequate steps to ensure that their admissions process was fair and free of fraud, bribery, cheating and dishonesty.

## II.  PARTIES

8.  Plaintiff Erica Olsen ("Olsen") is a former resident of Henderson, Clark County, Nevada, in Clark County, Nevada.  Olsen currently attends Stanford University and is a Santa Clara County, California, resident located in the Northern District of California.

9.  Plaintiff Kalea Woods ("Woods") is a former resident of San Diego County, California. Woods currently attends Stanford University and is a Santa Clara County, California, resident located in the Northern District of California.

10.  Defendant William "Rick" Singer ("Singer") is, upon information and belief, a resident of Newport Beach, California, in Orange County California, but also does business in Sacramento, California.  Singer is a citizen of California.

11.  Defendant The Edge College & Career Network, LLC d/b/a "The Key" ("The Key") is a limited liability corporation with its principal place of business located at 3415 American River Drive, Suite D, Sacramento, CA 95864, in Sacramento, California, and is a resident of Sacramento County, California and a citizen of California.  The Key also does business in Newport Beach, California, in Orange County, California.

12.  Defendant The Key Worldwide Foundation ("KWF") is a purported charitable organization with its principal place of business located at 265 Hartnell Place, Sacramento, CA 95825, and is a resident of Sacramento County, California and a citizen of California.

13.  Defendant University of Southern California  ("USC") is a private, highly selective university located in or near Los Angeles County, California and is a resident of Los Angeles County and citizen of California.

14.  Defendant Stanford University ("Stanford") is a private, highly selective university located in or near Palo Alto, California, in Santa Clara County, California, and is a resident of Santa Clara County and citizen of California.

15.  Defendant University of San Diego ("USD") is a private, highly selective university located in or near San Diego County, California, and is a resident of San Diego County and a citizen of California.

16. Defendant The University of Texas at Austin ("U-Texas") is a public, highly selective university located in or near Travis County, Texas, and is a resident of Travis County and a citizen of Texas.

17.  Defendant Wake Forest University is a private, highly selective university located in or near Forsyth County, North Carolina, and is a resident of Forsyth County and a citizen of North Carolina.

18.  Defendant Yale University is a private, highly selective university located in or near New Haven County, Connecticut, and is a resident of New Haven County and a citizen of Connecticut.

19.  Defendant Georgetown University is a private, highly selective university located in or near the District of Columbia, and is a resident and citizen of the District of Columbia.

### III.  JURISDICTION AND VENUE

20.  The Court has subject matter jurisdiction over the state law claims alleged in this Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A) because: (a) the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs; and (b) some of the Class members are citizens of a state that is different from the citizenship of some of the Defendants. In addition, federal question jurisdiction exists under 28 U.S.C. § 1331, in that Plaintiffs have alleged the violation of a federal statute (civil RICO).

21.  The Court has personal jurisdiction over Defendants USC, USD, Stanford, and UCLA, Singer, The Key, and KWF because Plaintiff's claims arise out of the business activities of those Defendants conducted in the State of California.

22.  The Court has personal jurisdiction over Defendants Yale University, Georgetown University, Wake Forest University, University of Texas at Austin, because each of those universities has solicited students residing in California to attend their universities; have accepted money, including application fees, from students residing in California applying to attend their universities; have recruited athletes residing in California; have participated in college sports competitions in California; have websites accessible by students in California; have entered into contracts with California residents; have engaged in systematic and continuous business in California; and generally have minimum contacts in California sufficient to satisfy the Due Process Clauses of the California and United States Constitutions.

23.  Plaintiffs both attend Stanford University and reside in this District.  Venue is proper in the Norther District of California because Defendants conduct a significant amount of business in this District and because Defendants have substantial contacts in this District.  Moreover, much of the fraudulent conduct which occurred took place within the Northern District of California, and Defendant Stanford resides in the Northern District of California. 28 U.S.C. § 1391; 28 U.S.C. § 84(a).

### IV.  ALLEGATIONS COMMON TO ALL COUNTS

24.  Defendant Singer owned The Key and served as Chief Executive Officer of KWF.

25.  The Key was a for-profit college counseling and preparation business that Singer founded in or about 2007 and incorporated in the State of California in or about 2012.

26.  KWF was a non-profit corporation in Newport Beach, California, that Singer established as a purported charity in or about 2012.

27.  In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax. KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

28.   Together, The Key and KWF constituted an "enterprise" as defined by 18 U.S. C. Sec. 1961(4) ("the Key Enterprise"), that is, an association, in fact, of entities engaged in, and the activities of which affected, interstate and foreign commerce ("the enterprise").   The Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

29.   ACT, Inc. is a non-profit organization headquartered in Iowa City, Iowa that administers the ACT exam, a standardized test that is widely used as part of the college admissions process in the United States.

30.   The College Board is a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a nonprofit organization headquartered in Lawrence Township, New Jersey, the College Board develops and administers the SAT, a standardized test that, like the ACT exam, is widely used as part of the college admissions process in the United States.

31.   The College Board and ETS also develop and administer SAT subject tests, which are also used as part of the college admissions process.

32.   The Defendant universities are highly selective universities.  Typically, each university receives tens of thousands of applications and only accepts a very small percentage of applicants.

33.   Acceptance of a student into one of these universities often makes it easier for a student to obtain a high-paying job or career after graduation.

34.   The athletic teams of Georgetown, Stanford, UCLA, USD, USC, U-Texas, Wake Forest and Yale compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

35.   Each of the Universities annually receives more than $10,000 in federal grants.

36.   Most selective colleges in the United States require students to take a standardized test, such as the ACT or the SAT, as part of the admissions process.

37.   The ACT includes sections on English, mathematics, reading and science. The SAT includes sections on writing, critical reading and mathematics.

**CLASS ACTION COMPLAINT**

38.  The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

39.  Prior to administering the ACT, test administrators must typically certify that they will administer the exam in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

40.  Similarly, prior to administering the SAT exam, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

41.  The ACT tests are sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

42. The SAT tests are sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

43.  All of the Defendant Universities require prospective students to submit standardized test scores as part of their application packages.

44.  When submitted, standardized test scores are a material part of the admissions process at each of the Universities. All of the Universities recruit student athletes, and may apply different criteria when evaluating applications from students with demonstrated athletic abilities. Recruited student athletes at USC, for example, are typically considered by a designated, admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes.

45.  The admissions offices at the Universities typically allot a set number of "slots" to each head coach of a varsity sport for that coach's recruited athletes. At each of the Universities, the

admissions prospects of recruited athletes are higher—and in some cases significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

46.  The principal purposes of the racketeering conspiracy in this case included the following:

(a) to facilitate cheating on college entrance exams;

(b) to facilitate the admission of wealthy students to elite universities as recruited athletes, regardless of their athletic abilities; and

(c) to enrich Singer and his co-conspirators personally.

47.  Among the manner and means by which Singer and his companies, along with the Defendants, carried out the racketeering conspiracy were the following:

(a) facilitating cheating on the SAT and ACT exams in exchange for bribes by arranging for or allowing:

(i) a third party to secretly take the exams in place of the actual students, or to replace the 'students' exam responses with his own;

(ii) designating applicants as purported recruits for competitive college athletic teams, without regard for the 'applicants' athletic abilities, in exchange for bribes; and

(iii) concealing the nature and source of the bribe payments by laundering payments through the KWF charitable accounts.

48.  On various dates between 2011 and September 2018, Singer and others committed and caused to be committed the following acts, among others, in furtherance of the racketeering conspiracy:

(a) cheating on standardized tests;

(b) Singer agreed with clients whose children were scheduled to take the SAT or ACT exams as part of the college admissions process to have another individual either take the tests in their children's place or correct the children's answers after they had completed the tests;

(c) Parents generally paid Singer between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into one of the KWF charitable accounts.

49. To facilitate the cheating, Singer counseled parents to seek extended time on the exams, including by having their children fake learning disabilities in order to obtain medical documentation which ACT, Inc. and the College Board typically required before granting students extended time.

50. Singer used the purported charitable donations from parents, at least in part, to bribe two SAT and ACT test administrators, including one administrator who administered the exams at a private school in Los Angeles, California; and a second test administrator who administered the exams at a public high school in Houston, Texas.

51. Singer typically caused the first test administrator in Los Angeles to be paid $10,000 from one of the KWF charitable accounts for each student who took the exam at his school. Singer initially paid the second test administrator in Houston through a third party, but in July 2018, Singer sent the Houston test administrator a $5,000 check for administering the test to a student.

52. In exchange for the bribe payments, the two test administrators allowed an imposter to secretly take the ACT and SAT tests in place of the children of Singer's clients, or to replace the children's exam responses with his own, in violation of the duty of honest services they owed to ACT, Inc. and the College Board.

53. Singer typically caused this imposter to be paid $10,000 per test, usually from one of the KWF charitable accounts.

54. The Los Angeles and Houston test administrators then caused the falsified exams to be returned to ACT, Inc. and the College Board via Federal Express and UPS, respectively, so that they could be scored.

55. Singer also was paid approximately $25 million by clients to bribe coaches and university administrators to designate the clients' children as recruited athletes, in violation of the duty of honest services which the coaches and school administrators owed to their employers, thereby facilitating the rich children's admission to the Universities.

**Yale University Bribes**

**CLASS ACTION COMPLAINT**

56.  As one example of the Student-Athlete Recruitment scam, Singer agreed in or about November 2017 to facilitate the admission of an applicant to Yale, in exchange for a payment of $1.2 million.

57.  Singer subsequently sent the head coach of the Yale women's soccer team an athletic "profile," created at Singer's direction, which falsely described the rich applicant as the co-captain of a prominent club soccer team in Southern California.

58.  The soccer coach thereafter designated this applicant as a recruit for the Yale women's soccer team despite the fact that, as the coach knew at the time, the Yale applicant did not even play competitive soccer.

59.  On or about January 1, 2018, after this Yale applicant was admitted to Yale, Singer mailed the soccer coach a check for $400,000, drawn on one of the KWF charitable accounts.

60.  In or about the spring and summer of 2018, the rich parent of the admitted student paid Singer approximately $1.2 million in multiple installments, including approximately $900,000 that was paid into one of the KWF charitable accounts.

61.  Singer similarly bribed coaches and administrators at each of the Universities to designate students as recruited athletes.

**University of Southern California Bribes**

62.  For example, Singer directed payments totaling approximately $350,000 to a private soccer club controlled by two USC soccer coaches.

63.  In exchange for these payments, the coaches designated four children of Singer's clients as recruits for the soccer team, thereby facilitating their admission to USC, despite the fact that none of the children played competitive soccer.

64.  Likewise, Singer made payments to a bank account at USC that funded the water polo team.

65.  In exchange for the bribes, the water polo coach designated two students as recruits for the water polo team, thereby facilitating the students' admission to USC.

66.  Singer also made private school tuition payments for the children of the water polo coach—under the guise of a fabricated scholarship—via checks drawn on one of the KWF

charitable accounts and sent to the school via U.S. Mail, in exchange for the water polo coach's commitment to designate one of Singer's clients as a recruit for the USC water polo team in the future.

67.  In addition, on multiple occasions, Singer's clients made payments of between $50,000 and $100,000 to a university account controlled by a senior official of USC's athletic department (the "USC Administrator"), typically an account for the USC Women's Athletic Board.

68. Singer also entered into a sham consulting agreement with the USC Administrator, pursuant to which, beginning in July 2018, he directed payments of $20,000 per month to the USC Administrator personally via checks drawn on one of the KWF charitable accounts and sent to the USC Administrator via U.S. Mail.

69. In exchange for the bribes, the USC Administrator helped facilitate the admission of several dozen students to USC as recruited athletes, even though many of those students had fabricated athletic credentials and some did not even play the sports they were purportedly being recruited to play.

**Georgetown University Bribes**

70.  Between 2012 and 2018, Singer paid a Georgetown tennis coach bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million. Singer typically made the payments from one of the KWF charitable accounts and sent them to the coach via U.S. Mail, including in several instances to the coach's residence in Falmouth, Massachusetts.

71.  In exchange for the bribes, the Georgetown coach designated approximately 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to the university

**UCLA Bribes**

72.   As another example, in or about 2016, Singer directed $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by the UCLA men's soccer coach.

73.  In exchange for that bribe, the coach arranged for the daughter of one of Singer's clients to be designated as a recruit for the UCLA women's soccer team, thereby facilitating her admission to UCLA.

**CLASS ACTION COMPLAINT**

1

**Wake Forest University Bribes**

2   74.  As yet another example, in or about 2017, Singer directed $100,000 from one of the

3   KWF charitable accounts to accounts controlled by the women's volleyball coach at Wake Forest,

4   including $10,000 to the Wake Forest Deacon Club, $40,000 to Wake Forest Women's Volleyball,

5   and $50,000 to a private volleyball camp the Wake Forest coach controlled. In exchange for this

6   money, the Wake Forest coach agreed to designate the daughter of one of 'Singer's clients—who

7   had previously applied to Wake Forest and been placed on the wait list—as a recruit for the

8   women's volleyball team, thereby facilitating her admission to the university.

9   **Stanford University Bribes**

10   75. In or about the fall of 2017, the Stanford sailing coach agreed to designate the child of

11   one of Singer's' clients as a recruit for the Stanford sailing team, in exchange for a payment to

12   Stanford sailing.

13   76.  In support of the student's application, Singer, together with others, created a student-

14   athlete "profile" that was submitted to Stanford, and that falsely suggested that this Stanford

15   applicant was a competitive sailor.

16   77. In May 2018, after the Stanford applicant deferred his application to Stanford for one

17   year, Singer directed a payment of $110,000 from one of the KWF charitable accounts to the

18   Stanford sailing program in exchange for the sailing coach's agreement to designate the Stanford

19   applicant as a sailing recruit in the following year's recruitment cycle.

20   78. In or about the summer of 2018, after the Stanford applicant decided to attend a different

21   university, the Stanford sailing coach agreed with Singer to use that same recruiting spot for the

22   child of another one of Singer's clients, in exchange for a $500,000 payment to the Stanford sailing

23   program.

24   79. In support of the student's application, Singer, together with others, created documents

25   falsely indicating that the student was a competitive sailor, although the student in fact had minimal

26   sailing experience.

27   80. Although that student ultimately did not apply to Stanford, Singer directed a payment of

28   $160,000 from one of the KWF charitable accounts to the Stanford sailing program.

**CLASS ACTION COMPLAINT**

81. The Stanford sailing coach agreed with Singer that the payment would serve as a "deposit" for a future student's purported recruitment.

**U-Texas at Austin Bribes**

82. In or about 2015, Singer paid a tennis coach at U-Texas approximately $100,000.

83. In exchange for this bribe, the U-Texas coach designated the son of one of Singer's clients, who did not play tennis competitively, as a recruit for the university's tennis team, thereby facilitating his admission to U-Texas.

**USD Bribes**

84. In or about 2016, in exchange for a bribe paid to a third-party, a varsity coach at USD designated the son of one of Singer's clients, who did not play that sport, as a recruit for the university's team, thereby facilitating his admission to USD.

85. In or about 2017, in exchange for an additional bribe, the same coach designated another student as a recruit to manage the same USD team, thereby facilitating her admission to USD.

86. To add insult to injury, the fraudulent scheme of these Defendants allowed rich participants in the fraudulent scheme to actually deduct payments made as bribes as charitable contributions on their tax returns.

87. Beginning in or about 2013, Singer agreed with certain clients of The Key to disguise bribe payments, at least in part, as charitable contributions to KWF.

88. At Singer's direction, employees of KWF sent these clients acknowledgment letters falsely attesting that no goods or services were exchanged for the purported donations.

89. A principal purpose and object of the tax fraud conspiracy was to allow clients of The Key to improperly deduct the cost of the bribes from their federal income taxes, and thereby to defraud the United States by underpaying federal income taxes.

90. Among the manner and means by which Singer and others carried out the tax fraud conspiracy were the following:

(a) registering KWF under *Section 501(c)(3) of the Internal Revenue Code;*

**CLASS ACTION COMPLAINT**

(b) directing purported charitable donations to KWF, even though those funds were intended to be used, at least in part, to bribe test administrators, athletic coaches and university administrators;

(c) ending acknowledgment letters falsely attesting that no goods or services were exchanged for the purported donations to KWF; and

(d) using the false acknowledgment letters as a basis to support fraudulent deductions from their federal income taxes.

91.  On various dates between 2012 and September 2018, Singer and others committed or caused to be committed numerous overt acts, among others, in furtherance of the tax fraud conspiracy.

92.  In or about 2016, Singer agreed with a Hillsborough, California couple who wanted their daughter to attend UCLA (the "Hillsborough Parents") to use bribes to facilitate their daughter's admission to the university as a purported soccer recruit.

93.  On or about May 24, 2016, the Hillsborough Parents emailed Singer their daughter's high school transcript and standardized test scores.

94.  Singer forwarded the transcript and test scores to the UCLA men's soccer coach, who forwarded them to the UCLA women's soccer coach.

95.  On or about June 28, 2016, the UCLA Student-Athlete Admissions Committee approved the Hillsborough Parents' daughter for "provisional student-athlete admission," pursuant to which she would be admitted to the university on the condition that she met certain requirements, including that she successfully completed her senior year of high school and participated on the UCLA team as a student-athlete for a minimum of one full academic year.

96.  On or about July 6, 2016, the UCLA men's soccer coach emailed Singer that the Hillsborough Parents' daughter had been provisionally admitted to the university as a student-athlete.

97.  On or about July 7, 2016, Singer directed a payment of $100,000 from one of the KWF charitable accounts to a sports marketing company controlled by the UCLA men's soccer coach.

1     98.  On or about July 8,2016, an employee of KWF emailed a $250,000 invoice to the

2  mother of UCLA Applicant. The invoice stated: "Private Contribution- Letter of receipt will be

3  provided upon payment."

4     99.  On or about July 11, 2016, the father of the UCLA Applicant emailed Singer asking him

5  to confirm in writing that the $250,000 would be returned to them in the event his daughter did not

6  receive final admission to UCLA. Singer replied that he would return the money in the event the

7  UCLA Applicant did not receive final admission to UCLA.

8     100.  On or about July 15, 2016, the Hillsborough Parents donated 2,150 shares of

9  Facebook, Inc. stock to KWF as a purported charitable contribution. The stock transfer settled that

10  same day.

11     101.  On or about July 21,2016, a KWF employee sent the Hillsborough Parents a letter

12  acknowledging a charitable contribution of $251,159. The letter stated: "Your generosity will allow

13  us to move forward with our plans to provide educational and self-enrichment programs to

14  disadvantaged youth." The letter falsely stated that "no goods or services were exchanged" for the

15  donation.

16     102.  On or about November 2017, the Hillsborough Parents filed personal tax returns that

17  falsely reported total gifts to charity in 2016 of $1,061,890—a sum that included the purported

18  contribution to KWF.

19                    **V. ALLEGATIONS RELATING TO THE PLAINTIFFS**

20     103.  Plaintiff Olsen is a student at Stanford University.

21     104.  When she applied to college, she had graduated from an accredited high school and

22  passed all requirements for applying to college.  She had stellar standardized test scores (ACT score

23  of 35 and SAT score of 2290).  She also had athletic talent.  She was a dancer and would later

24  qualify for the Stanford elite dancing squad, representing the school at football and basketball

25  games.

26     105.  In approximately 2017, Olsen applied to Yale University, one of the elite universities

27  whose employees participated in the fraudulent bribery and cheating schemes referenced above.

28

**CLASS ACTION COMPLAINT**

1   Olsen paid an application fee (or rather, she reimbursed her parents for the application fee) of

2   approximately $80.

3      106.  At the time she applied, she was never informed that the process of admission was an

4   unfair, rigged process, in which rich parents could buy their way into the university through bribery.

5   Had she known that the system at Yale University was warped and rigged by fraud, she would not

6   have spent the money to apply to the school. She also did not receive what she paid for—a fair

7   admissions consideration process.

8      107.  Olsen has also been damaged because she is a student at Stanford University, another

9   one of the universities plagued by the fraud scandal.  Her degree is now not worth as much as it was

10  before, because prospective employers may now question whether she was admitted to the

11  university on her own merits, versus having parents who were willing to bribe school officials.

12     108.  Similarly, Plaintiff Woods is also a Stanford student.  She too had stellar test scores

13  (32 ACT and 2100 SAT).  She too had graduated from an accredited high school and passed all

14  requirements for applying to college.  Like Olsen, Woods also had athletic skills.  In approximately

15  2017, Woods applied to USC for admission and reimbursed her parents for the admission fee of

16  approximately $85.

17     109.  At the time she applied, Woods similarly was never informed that the process of

18  admission at USC was an unfair, rigged process, in which parents could buy their way into the

19  university through bribery and dishonest schemes.  Had she known that the system at USC was

20  warped and rigged by fraud, she would not have spent the money to apply to the school. She also

21  did not receive what she paid for—a fair admissions consideration process.

22     110.  Like Olsen, Woods has also been damaged because she is a student at Stanford

23  University, another one of the universities plagued by the fraud scandal.  Her degree is now not

24  worth as much as it was before, because prospective employers may now question whether she was

25  admitted to the university on her own merits, versus having rich parents who were willing to bribe

26  school officials.

27     111.  Plaintiffs will adequately represent the members of the Class, and their claims are

28  typical of other Class Members.

**CLASS ACTION COMPLAINT**

## VI. CLASS ACTION ALLEGATIONS

114.  Plaintiffs bring this action on their own behalf and, pursuant to Federal Rule of Civil Procedure, 23(a), (b)(2), and (b)(3), on behalf of the following Class ("the Class").  The Class is initially defined as follows:

**All individuals who, between 2012 and 2018, applied to UCLA, USC, USD, Stanford University, UT-Texas at Austin, Wake Forest University, Georgetown University, or Yale University, paid an admission application fee to one or more of these universities, with respect to an admission application that was rejected by the university.**

115.  Excluded from the Class are:

(a) any employees of Defendants, including any entity in which any of the Defendants has a controlling interest, is a parent or a subsidiary of, or which is controlled by any of the Defendants;

(b) the officers, directors, and legal representatives of Defendants; and

(c) the Judge and the court personnel in this case as well as any members of their immediate families.  Plaintiffs reserve the right to amend the definitions of the Class if discovery, further investigation and/or rulings by the Court dictate that they should be modified.

116.  *Numerosity.  Fed. R. Civ. P. 23(a)(1).*  The members of the Class are so numerous that the joinder of all members of the Class in a single action is impractical.  While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants have control over how many applicants have been denied in the past.  Given the number of applications on a daily basis, it stands to reason that the number of Class Members is at least in the thousands.  As an example, in 2017, Stanford University received 38,828 applications and only accepted 2,210 students.  That means for that one university, and that one year alone, there will be over 36,000 Class Members.  The Class Members are readily identifiable from investigation and records in the Defendants' possession, custody, or control, such as application records, records of admission/denial, and financial records.

117.  *Commonality and Predominance.  Fed. R. Civ. P. 23(a)(2) and (b)(3).*  There are questions of law and fact common to the Class Members.  These common questions of law and fact include, without limitation:

(a) did the universities know that this fraudulent scheme was being conducted and fail to take corrective action;

(b) were the universities negligent in not discovering the fraudulent scheme of their employees;

(c) should the university have engaged in closer monitoring of its employees and individuals involved with the admissions process;

(d) what quality control standards were in place at the universities to ensure that this kind of conduct did not occur, and to ensure the fairness of the admissions process; and

(e)  what were the acts of the Defendants in furtherance of the fraudulent scheme.

118.  *Typicality. Fed. R. Civ. P. 23(a)(3).*  Plaintiffs' claims are typical of other Class Members because Plaintiffs' applications for admission did not benefit from a proper review due to the fraudulent process which was caused by the conduct of the Defendants.  Moreover, each of the Plaintiffs, like other Members of the Class, lost the amount of the application fee which they paid.

119. *Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).*  Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have retained competent counsel experienced in litigation of class actions, including consumer class actions. Plaintiffs' claims are typical of the claims of other Class Members, and Plaintiffs have the same non-conflicting interests as the other Class Members.  Therefore, the interests of the Class Members will be fairly and adequately represented by Plaintiffs and their counsel.

120. *Superiority of Class Action.  Fed. R. Civ. P. 23(b)(3).*  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in the management of this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to the parties and to the Court.  Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence

**CLASS ACTION COMPLAINT**

1   of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate

2   would go un-remedied.

3       121.  Class certification is also appropriate under *Fed. R. Civ. P. 23(a)* and *(b)(2)* because

4   the Defendants have acted or refused to act on grounds generally applicable to the Class, such that

5   final injunctive relief or corresponding declaratory relief is appropriate to the Class as a whole.

6   **VII. LEGAL BASES FOR RELIEF**

7   **COUNT I**

8   (Defendants Singer, The Key and KWF: Civil RICO, 18 U.S.C. Sec. 1962(c), 1964 et al.)

9       122.  Plaintiff incorporates by reference Paragraphs 1 through 121 as if more fully set forth

10  herein.

11      123.  Together, The Key and KWF constituted an "enterprise" as defined by *18 U.S. C. Sec.*

12  *1961(4)* ("the Key Enterprise"), that is, an association, in fact, of entities engaged in, and the

13  activities of which affected, interstate and foreign commerce ("the enterprise").   The Key

14  Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a

15  common purpose of achieving the objectives of the enterprise.

16      124.  In order to further the purposes of the Key Enterprise's conspiracy, Singer used The

17  Key and KWF in an illegal manner, and participated in numerous overt acts in furtherance of The

18  Key Enterprise conspiracy.

19      125.  In furtherance of the illegal goals of the Key Enterprise, Singer conspired with certain

20  University employees, certain impostor test-takers, certain test administrators, and certain wealthy

21  parents of college students, to violate *18 USC Sec. 1962(c);* that is, to conduct and participate,

22  directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of

23  racketeering activity, as defined in *18 USC Secs. 1961, 1962, and 1964;* consisting of multiple

24  illegal acts indictable under:

25      a. *18 USC Sec. 1341* (relating to mail fraud);

26      b. *18 USC Secs. 1341 and 1346* (relating to honest services mail fraud);

27      c. *18 USC Sec. 1343* (relating to wire fraud);

28      d. *18 USC Secs. 1343 and 1346* (relating to honest services wire fraud); and

e. *18 USC Sec. 1956(a)(l)(B)(i)* (relating to the laundering of monetary instruments); and

f.  using a charitable organization to fraudulently obtain tax-exempt status, while simultaneously abetting the wealthy parents in violating tax laws by claiming "donations" to KWF as charitable donations.

126.  In fact, Singer himself has been indicted under the criminal version of RICO in the United States District Court for the District of Massachusetts.

127.  Each of the Plaintiffs herein, and all Class Members, have standing to bring a claim under civil RICO because each of them has suffered a concrete and distinct injury—at a minimum, the payment of an application fee to one or more of these seven universities—which they paid under the assumption that the college application process at these universities was fair and impartial.

128.  Students do not have unlimited funds to pay for application fees.  They must pick and choose which university or universities to apply to based upon their available funding, the cost of the application fee, and the likelihood that they will be accepted.  Each of these students had a right to know that their application was going to be part of a review process corrupted by rampant fraud and back-door bribery.

129.  The illegal acts in furtherance of the enterprise by Defendants Singer, The Key and KWF proximately caused damage to the Plaintiffs and the Class Members.

130.  Accordingly, Plaintiffs, on behalf of themselves and the Class Members, brings this Count I under *18 U.S.C. Sec. 1964(c),* which provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ….

WHEREFORE, Plaintiffs pray for judgment in their favor on Count I of the Complaint against Defendants Singer, The Key, an KWF, for compensatory damages in an amount which is fair and reasonable to compensate the Class members for their damages, including but not limited to the recoupment of all admission fees paid to said universities during the applicable statute of

1  limitations period, claw-back of all illegal fees paid by bribing parents to Singer, The Key and/or

2  KWF, for treble damages, costs of suit, and a reasonable attorney's fee.

3  **COUNT II**

4  (University Defendants: California Consumers Legal Remedies Act: *Civil Code Secs. 1750 - 1784*)

5  131.  Plaintiff incorporates by reference Paragraphs 1 through 131 as if more fully set forth

6  herein.

7  *132.  The California Consumers Legal Remedies Act ("CLRA"),* provides in *Cal. Civil Code*

8  *1770(a)(5)* that it is a deceptive trade practice for a seller of goods or services to represent that

9  *"...goods or services have sponsorship, approval, **characteristics**, ingredients, uses, **benefits**, or*

10  *quantities **that they do not have** or that a person has a sponsorship, approval, status, affiliation, or*

11  *connection that he or she does not have."* (emphasis added)

12  133.  Each of the seven Universities have advertised that their college admissions process is

13  fair and unbiased and based upon the applicant's merit:

14  (a) Yale University's website boasts:

15  *Our difficult - yet fascinating and rewarding - job is to select that class. How do we do it?*

16  *An applicant's academic strength is our first consideration. We review grades, standardized*

17  *test scores, and evaluations by a counselor and two teachers to determine academic*

18  *strength. The Admissions Committee then factors in student qualities such as motivation,*

19  *curiosity, energy, leadership ability, and distinctive talents.*

20  *Ultimately, our goal is to build an extraordinary class of students. If you want to be a part of*

21  *it, we welcome your application. To get started, please follow the links to the right.*

22  https://admissions.yale.edu/first-year-application-process

23  (b)  Stanford University also states that admission is based upon such items as the high

24  school transcript, test scores, extracurricular activities, intellectual vitality, and other factors:

25  *The primary criterion for admission to Stanford is academic excellence. We look for your*

26  *preparation and potential to succeed. We expect you to challenge yourself throughout high*

27  *school and to do very well. The most important credential that enables us to evaluate your*

28  *academic record is the high school transcript. Remember, however, that our evaluation goes*

1    *beyond any numerical formula. There is no minimum GPA or test score; nor is there any*

2    *specific number of AP or honors courses you must have on your transcript in order to be*

3    *admitted to Stanford.*

4    https://admission.stanford.edu/apply/selection/

5    (c) Georgetown University makes similar claims on its website:

6    *Georgetown maintains a holistic review process with a focus on success in your high school*

7    *curriculum as the foundation of a competitive application.*

8    *https://uadmissions.georgetown.edu/firstyear/preparation*

9        (d) UCLA also claims that admissions are based upon student merit, and boasts that it has

10   high "quality control" to make the admissions system reliable:

11   *Each year, UCLA considers many more excellent applicants for freshmen admission than it*

12   *can possibly admit. The goal of the campus' admissions review process is to single out from*

13   *a large and growing pool of academically strong applicants those unique individuals who*

14   *have demonstrated the intellectual curiosity, tenacity, and commitment to community service*

15   *expected of the UCLA graduate. These select applicants are the ones who would contribute*

16   *the most to UCLA's dynamic learning environment; they are also the applicants who would*

17   *make the most of being immersed in it. Although high school grade point average and*

18   *standardized test scores are important indicators of academic achievement used in UCLA's*

19   *admissions review, they only tell part of the story.*

20   * * *

21   *Selection is based on a comprehensive review of all information—both academic and*

22   *personal—presented in the application. All applications are read twice, in their entirety, by*

23   *professionally trained readers. After independently reading and analyzing a file, the reader*

24   *determines a comprehensive score that is the basis upon which the student is ultimately*

25   *admitted or denied. In addition, admissions managers conduct multiple checks for*

26   *consistency and completeness throughout the reading process. While this evaluation process*

27   *is based on human judgments rather than a system that quantifies factors and incorporates*

28   *them into a numerical formula, the extensive reader training, comprehensive reading of*

**CLASS ACTION COMPLAINT**

1    *files, as well as other monitoring procedures,* **ensure that the process is highly reliable.**

2    **Formal tests of reliability are conducted regularly to assure quality control***.

3    *(emphasis added)*

4    http://www.admission.ucla.edu/Prospect/Adm_fr/FrSel.htm

5    (e)  USC also makes similar claims that its admission process is based upon student merit:

6    *Like many highly selective universities, we conduct a comprehensive, holistic review*

7    *of your application to consider academic and personal characteristics. We will review*

8    *your performance in school, the rigor of your program, writing skills and test scores.*

9    *We also consider personal qualities, as revealed in community involvement,*

10   *leadership and achievements.*

11   https://admission.usc.edu/apply/our-admission-process/

12   (f) Wake Forest makes similar claims on its website:

13   *Candidates for admission must furnish evidence of maturity and educational achievement,*

14   *plus evidence of character and motivation for study in the College of Arts and Sciences.*

15   *High school curriculum and classroom performance, combined with the student's writing*

16   *ability, extracurricular activities, and evidence of character and talent, are the most*

17   *important criteria for admission.*

18   https://admissions.wfu.edu/apply/process/

19   (g) University of Texas at Austin also promises a "holistic review" of the application based

20   upon the student's merit:

21   *All applications receive an individualized holistic review as part of the UT Austin*

22   *admissions decision review process.*

23   https://admissions.utexas.edu/apply/decisions

24   The university even went so far as to eschew the influence of money in the admissions process:

25   *The suspicion of a double standard that favors well-connected students is not new,*

26   *particularly for more selective institutions.* **Ensuring that fair and transparent admissions**

27   **processes exist across the U. T. System is necessary to maintain public trust.** *Recruitment*

28   *and admissions policies that are disclosed to the public and are consistent with stated*

*university goals garners public trust that student admissions are **centered on merit**. The integrity of the admissions processes at each of the University of Texas institutions depends upon the unbiased determination of the appropriate **merits of each applicant**. **Attempts to influence those processes by use of a person's community stature, promise of financial donation (or threat to discontinue financial donation) or any other means that do not directly address the merits of the applicant are inappropriate** and not consistent with the status of the university as a public institution of the state of Texas.*

https://www.utsystem.edu/sites/default/files/documents/Best%20Practices%20in%20Admissions%20Processes%20for%20Undergraduate%20and%20Professional%20Programs/ut-system-admissions-best-practices-2014-07.pdf134.   Each of the university websites have made similar claims throughout the Class period that admissions are solely based upon the student's merit.

134.   These representations, it has now come to be learned, were false, and the statements about the university represented goods and services which had characteristics which they did not have.  In fact, as has been shown above, each of the admissions processes at these universities was tainted by corruption, such that those parents with children who had mediocre grades and test scores were allowed admission based upon the amount of bribery money they paid university insiders.

135.   *Cal Civ. Code. Sec. 1780* provides that if the Defendant engages in a practice declared deceptive under the Act, the Plaintiff may file a complaint either alone or as a class action (see Sec. 1781) a civil action for damages:

*(a)  Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by* Section 1770 *may bring an action against that person to recover or obtain any of the following:*

   *(1)  Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).*

   *(2)  An order enjoining the methods, acts, or practices.*

   *(3)  Restitution of property.*

   *(4)  Punitive damages.*

1    *(5)  Any other relief that the court deems proper.Subsection (e)* also allows the

2    prevailing plaintiff to recover costs and attorneys fees.

3    136.  *Subsection (d)* provides that an action under this Section may be brought in the county

4    in which the person against whom it is brought resides, has his or her principal place of business, or

5    is doing business, or in the county where the transaction or any substantial portion thereof occurred.

6    Plaintiff attaches hereto a Declaration pursuant to *Sec. 1780(d)* stating that venue in this District is

7    appropriate.

8    137.  As a direct and proximate result of the deceptive practices of the university

9    Defendants, each of the Plaintiffs, and all of the Class Members were damaged, in that they paid

10   admission application fees based upon the representations of these Defendant Universities that the

11   application process was fair, neutral, and based upon the applicant's merit.

12   137A.  Under California and Ninth Circuit case law, reliance is not an element which needs

13   to be proved to establish a violation of the CLRA.

14   138.  The actions of the University Defendants warrant the imposition of punitive damages

15   in addition to compensatory damages.

16   WHEREFORE, Plaintiff prays for Judgment on Count II against the University Defendants

17   for compensatory damages in an amount which is fair and reasonable, for punitive damages in an

18   amount sufficient to punish the Defendants and deter future conduct, for court costs, reasonable

19   attorney's fees, and such other relief as the Court deems just and proper.

20                                          **COUNT III**

21                  (University Defendants:  California Unfair Competition Law,

22   *Cal. Bus. and Prof. Code Secs*. 17200 – 17209)139.  Plaintiff incorporates by reference

23   Paragraphs 1 through 138 as if more fully set forth herein.

24   140.  The California Unfair Competition Law ("UCL:") defines "unfair competition" as any

25   of the following wrongs: (1) an "unlawful" business act or practice; (2) an "unfair" business act or

26   practice; (3) a "fraudulent" business act or practice; (4) "unfair, deceptive, untrue or misleading

27   advertising"; and (5) any act prohibited by Sections 17500 through 17577.5.  These definitions are

28

1  disjunctive, and each of the wrongs operates independently from the others.  "In other words, a

2  practice is prohibited as 'unfair' or ['fraudulent'] even if not 'unlawful' and vice versa."

3      141.  Each of the University Defendants represented multiple times on its websites that its

4  college admission process would be based upon the individual's test scores, grades, activities and

5  other items of merit, as opposed to the bribe money, and lack thereof, that could be paid to

6  university insiders.

7      142.  The University Defendants knew or should have known of these corrupt practices

8  because the funds were often going into University accounts, and to prominent University figures

9  such as coaches and directors in charge of University accounts.

10      143.  To represent to students that the application process is based on merit, while

11  simultaneously turning a blind eye to rampant bribery going on with the university's employees,

12  constitutes a violation of the UCL, and constitutes: an "unlawful" business act and practice; "unfair"

13  business acts and practices;" fraudulent business acts and practices; and "unfair, deceptive, untrue,

14  and misleading advertising."

15      144.  Moreover, the failure of these Universities to have audits and other quality control

16  mechanisms in place to ensure that this type of behavior did not occur is, in itself, an unfair business

17  practice.

18      145.  Each of the University Defendants engaged in "business practices" relating to its

19  admission process and the quality control thereof.

20      Obtaining students' tuition and fees for educational services and admission services is a big

21  business for Defendants.

22      147.  Each of the Plaintiffs and the Members of the Class have suffered an economic injury

23  in fact and have lost money or property as a proximate result of the unfair competition of the

24  Defendant Universities—namely, at the very minimum, the application fees paid to the universities

25  for admission.

26      148.  Class Members were unaware of the material fact that the University Defendants'

27  admission policies consisted of allowing in the students whose parents bribed university officials

28  with the most money, and necessarily rejecting the vast majority who did not offer bribes.

**CLASS ACTION COMPLAINT**

149.  The misrepresentations by the University Defendants on their websites about the application acceptance decision being based upon student merit was material.  A misrepresentation is material if a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.  Obviously, whether college officials accept bribes from prospective students' parents would be an objectively material factor to know before deciding whether to apply to a school.

150.  The Plaintiffs are entitled to full restitution of the amounts paid by Plaintiffs to Defendants for admissions application fees during the relevant statute of limitations period.

WHEREFORE, Plaintiff prays for judgment in Plaintiffs' favor against the University Defendants on Count III, for equitable relief against the University Defendants, including restitution of all moneys paid to Defendants as application fees during the relevant statute of limitations period, for a reasonable attorney's fee as a "private attorney general" pursuant to *Code of Civil Procedure Section 1021.5,* for court costs, and such other relief as the Court deems just and proper.

### COUNT IV

(University Defendants: Negligence)

151.  Plaintiff incorporates by reference Paragraphs 1 through 150 as if more fully set forth herein. 152.  The University Defendants had a duty to potential applicants such as the Plaintiffs and the Class Members to ensure that its college application process was performed fairly, honestly, and without corruption or bribery; and that students were only allowed to the university based upon their merit.

153.  The University Defendants could have ensured the integrity of that process by conducting regular audits, instituting security procedures, monitoring its coaches and employees, and other safeguarding procedures.

154.  Each of the Defendant Universities breached that duty and failed to exercise ordinary care that a reasonably prudent person would exercise in handling the function of college admissions, and were negligent and careless in the following respects:

(a) giving free reign to athletic coaches and directors to fill athletic slots however they wanted to with inadequate oversight;

**CLASS ACTION COMPLAINT**

(b) failing to conduct regular audits of university accounts;

(c) failing to observe fraudulent sources of funds coming into university accounts controlled by the coaches, athletic directors and other university employees;

(d) allowing coaches and employees to remain in charge of university funds and admission practices after it was known or suspected that they were engaging in fraudulent activity; and

(e) failing to institute better quality controls.

155.  As a direct and proximate result of the negligence of the University Defendants, Plaintiffs and the Class Members were damaged, in that they paid admission application fees to the Defendants.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count V, for compensatory damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class Members, for court costs, and for such other relief as the Court deems just and proper.

**CLASS ACTION COMPLAINT**

1

2                                            Respectfully Submitted,

3                                            THE MEDLER LAW FIRM, APC

4                                            **/s/ John F. Medler, Jr., Esq**. SBN: 266474
                                             2030 Main Street Suite 1300
5                                            Irvine, CA 92614
                                             Tel: (949)-260-4940
6                                            Fax: (949)-260-4944
                                             john@medlerlawfirm.com
7

8                                            ZIMMERMAN REED LLP

9
                                             **David M. Cialkowski**\*
10                                           david.cialkowski@zimmreed.com
                                             **Brian C. Gudmundson**\*
11                                           brian.gudmundson@zimmreed.com
                                             1100 IDS Center, 80 South 8th Street
12                                           Minneapolis, MN 55402
                                             Telephone: (612) 341-0400
13                                           Facsimile: (612) 341-0844

14

15                                           ZIMMERMAN REED LLP
                                             **/s/ Caleb Marker**
16                                           Caleb Marker (SBN 269721)
                                             caleb.marker@zimmreed.com
17                                           2381 Rosecrans Avenue, Suite 328
                                             Manhattan Beach, CA 90245
18                                           Telephone: (877) 500-8780
                                             Facsimile: (877) 500-8781
19

20                                           *\* subject to admission pro hac vice*

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

1

2

## **DECLARATION**

3

The undersigned counsel affirms and declares, under *Cal. Civ. Code Sec. 1780(d),* that venue in this

4

County and District is appropriate under the provisions of the CLRA.

5

6                                                                   **/s/ John F. Medler, Jr.**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**